UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

                                         Case No. 10-79280-las

IDEAL MORTGAGE BANKERS, LTD.,
*a/k/a* LEND AMERICA,
*a/k/a* CONSUMER FIRST LENDING KEY,

                                         Chapter 7

                  Debtor.
-----------------------------------------------------------x


# MEMORANDUM DECISION

*Appearances*:

Global Appraisal Solutions, LLC
*Pro Se*
By: Laurence Holzer, Managing Member
1497 Main Street, #210
Dunedin, Florida 34698


SilvermanAcampora LLP
*Attorneys for the Chapter 7 Trustee, R. Kenneth Barnard*
By: Lon Seidman, Esq.
Anthony Acampora, Esq.
Justin Krell, Esq.
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753

HON. LOUIS A. SCARCELLA, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the motion filed on April 22, 2014 (the "Claims Allowance Motion") [*dkt no. 351*] by Laurence Holzer ("Holzer"), individually and as managing member of Global Appraisal Solutions, LLC ("Global"), by which Global seeks, among other things, the allowance of its claims against Ideal Mortgage Bankers Ltd., a/k/a Lend America, and a/k/a Consumer First Lending Key (the "Debtor"). In short, Global argues that its claims against the Debtor are secured and thus entitled to immediate payment in full or, in the alternative, constitute administrative expenses of this bankruptcy case, likewise mandating immediate payment in full. Also, before the Court is the objection dated June 4, 2014 of R. Kenneth Barnard, Esq., the chapter 7 Trustee (the "Trustee"), to proof of claim numbers 4-1 ("Claim No. 4-1"), 4-2 ("Claim No. 4-2"), and 27 ("Claim No. 27", together with Claim No. 4-1 and Claim No. 4-2, the "Global Proofs of Claim") filed by Global (the "Claims Objection Motion" [*dkt. no. 359*], together with the Claims Allowance Motion, the "Claims Motions"). The Trustee contends that Claim No. 27 amended and superseded Claim No. 4-1 and Claim No. 4-2, and that Claim No. 27 is nothing more than a general unsecured claim. At issue, therefore, is the allowance of Claim No. 4-1 and Claim No. 4-2 and the appropriate treatment of Claim No. 27. As the Claims Motions are essentially taking opposing positions on the same issue and arise out of a common set of facts, the Court considered and heard the Claims Motions simultaneously at two separate hearings. At the conclusion of the hearings, the Court took the matter under advisement. Having considered the Claims Motions, the responses and arguments of Holzer and counsel for the Trustee, and having reviewed the record in this case, the Court now issues this Memorandum Decision. The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P." or the "Bankruptcy Rules").[1]

## **JURISDICTION**

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Order of

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Reference entered by the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 157(a), dated August 28, 1986, as amended by Order dated December 5, 2012, effective *nunc pro tunc* as of June 23, 2011.  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (B).  It seeks to determine whether a creditor is entitled to a priority claim.  Therefore, it "stems from the bankruptcy itself", and may constitutionally be decided by a bankruptcy judge. *Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011).

## BACKGROUND[2]

### I.    General.

#### A.    Events Leading up to the Debtor's Bankruptcy.

The Debtor was a mortgage lender located in Suffolk County, New York that originated loans and participated in mortgage origination programs sponsored by the United States Department of Housing and Urban Development ("HUD").  The Debtor was approved by HUD to do business in 48 states and the District of Columbia.

Apparently in the latter half of 2009, various transactions and events left the Debtor without sufficient funds to continue its business.  On or about December 1, 2009, the Debtor lost its ability to originate loans backed by HUD.  On December 4, 2009, the New York State Banking Department issued a cease and desist order that required the Debtor cease engaging in activities as a mortgage banker.  Thereafter, New York State and Federal authorities appeared at the Debtor's offices and took possession of the Debtor's books, records, computers, files, and documents.  Certain officers of the Debtor, including Michael Ashley ("Ashley"), its chief business strategist, and Helene DeCillis, its chief operating officer,

---

[2]  The relevant facts are not in dispute, except as otherwise indicated. The facts are taken from the pleadings, exhibits, and other papers submitted by the parties in the bankruptcy case and related adversary proceedings, including the Court's Claims Register, and other motions filed by third parties on the Court's docket.  The Court has taken judicial notice of the contents of the docket in this bankruptcy case and the related adversary proceedings. *Teamsters Nat'l Freight Indus. Negotiating Comm. et al. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*, 151 Fed. Appx. 46, 48 (2d Cir. 2005) (stating that courts are empowered to take judicial notice of public filings, including a court's docket); *Levine v. Egidi*, No. 93 C 188, 1993 WL 69146 (N.D. Ill. Mar. 8, 1993); *MedMal Trust Monitor v. VIII SV 5556 Lender, LLC (In re Saint Vincent's Catholic Med. Ctrs. of N.Y.)*, 440 B.R. 587, 599 (Bankr. S.D.N.Y. 2010) (taking judicial notice of the docket in the underlying bankruptcy case); *In re Campbell*, 500 B.R. 56, 59 n. 7 (Bankr. D.N.M. 2013) (electing to take judicial notice of the entire file in the case for sake of completeness as a bankruptcy court has the inherent authority to take judicial notice of entries on its own docket).

were the subject of a criminal investigation.  Allegations surfaced that the Debtor had misappropriated funds available under its warehouse line of credit by failing to use these funds for the purpose for which they were intended, i.e., to pay off, at closing, prior mortgages and liens purportedly refinanced through the Debtor.

An involuntary chapter 7 petition was filed against the Debtor by EAM Land Services, PSS Settlement Services, LLC, Evans National Leasing, Inc., and Michael and Kimberly McLean (the "Petitioning Creditors") on November 30, 2010 (the "Petition Date").  The case was assigned to Bankruptcy Judge Dorothy T. Eisenberg.  On December 2, 2010, the Petitioning Creditors filed a motion seeking the appointment of an interim trustee.  After a hearing, Judge Eisenberg granted the motion and entered an order on December 13, 2010 directing the Office of the United States Trustee to immediately appoint an interim trustee.  R. Kenneth Barnard was appointed as the interim trustee on December 15, 2010, and he subsequently became the permanent trustee pursuant to 11 U.S.C. § 702(d).  The order of relief was entered on December 29, 2010.  Shortly thereafter, in furtherance of his investigation of the Debtor's financial affairs, pre-bankruptcy activities and assets and liabilities, the Trustee sought and obtained several orders pursuant to Bankruptcy Rule 2004 authorizing him to issue third party subpoenas to various financial institutions and certain officers, employees and legal counsel of the Debtor.  To assist in his investigation, the Trustee retained the firm of SilvermanAcampora LLP as special litigation counsel pursuant to an order dated June 30, 2011.

**B.    Debtor's Prepetition Relationship with Global.**

As part of the Debtor's loan origination process, either the Debtor or the potential borrower would engage the services of an appraisal management company on the Debtor's approved vendor list to conduct an appraisal of the real property for which the Debtor served as the originating lender.  Global, an appraisal management company, was one of five appraisal management companies on the Debtor's approved vendor list.  Global is wholly owned by Holzer.  Global did not directly perform the appraisals, rather it served as a central source from which appraisals could be ordered nationally, and managed the appraisal process.

3

There was no written contract between the Debtor and Global specifying the terms of Global's appraisal services.  In those instances where the Debtor ordered an appraisal through Global, the Debtor would simply contact Global, provide the location of the real property that was the subject of the appraisal and Global would then direct one of its local appraisers to conduct the appraisal.  Global would invoice the Debtor for the cost of the appraisal upon the completion or cancellation of each appraisal order.  The cost to the Debtor included the appraiser's fee and Global's fee for managing the appraisal process.  If the Debtor cancelled an appraisal order, Global would nevertheless charge the Debtor its appraisal management fee.

During their relationship, Global claimed that the Debtor failed to pay for certain earned and unearned appraisal fees.  On or about November 19, 2009, Global, by its then attorneys, Fellheimer & Eichen, LLP (the "Fellheimer Firm"), filed an action against the Debtor in the United States District Court for the Eastern District of New York, Case No. 09-cv-05078 (JFB)(WDW) (the "Global Action"), seeking to recover from the Debtor amounts allegedly due for unpaid appraisals.  The Debtor defaulted in the Global Action.  As a result, on April 6, 2010, prior to the Petition Date, Global obtained a default judgment (the "Default Judgment") against the Debtor in the sum of $763,157.00, plus interest. The amount of the Default Judgment was based upon a February 19, 2010 affidavit by Holzer which asserted that the Debtor owed (a) $45,417 for 158 completed but unpaid appraisal reports ordered by the Debtor and (b) $717,740 for 1594 appraisals ordered by the Debtor, but subsequently cancelled. Attached to the Holzer affidavit were two lists prepared by Holzer, one setting forth appraisals that were completed, the other listing those appraisals that were cancelled.  The Default Judgment was docketed on May 17, 2010 with the Clerk of Suffolk County, New York (the "Suffolk County Clerk").  Global did not docket the Default Judgment in any other county in New York or in any other location in which the Debtor may have had assets.

On May 17, 2010, Global obtained an execution judgment (the "Execution Judgment") from the Suffolk County Clerk which directed the Sheriff of Suffolk County to satisfy the Default Judgment from any of the Debtor's real or personal property within Suffolk County.  The writ of execution was returned

unsatisfied.

Continuing its efforts to collect upon the Default Judgment, on November 29, 2010, Global, by the Fellheimer Firm, filed an action in the U.S. District Court for the Eastern District of New York (the "District Court"), Case No. 10-cv-05490 (JFB)(ETB) (the "Global Fraudulent Conveyance Action"), seeking to recover certain alleged fraudulent transfers made by the Debtor to Ashley and several of Ashley's relatives and Ashley affiliated entities. As discussed above, the involuntary bankruptcy petition was filed the next day, and the Global Fraudulent Conveyance Action as against the Debtor was stayed pursuant to the automatic stay under 11 U.S.C. § 362(a).

### C.    Claim No. 4-1.

On February 7, 2011, the Fellheimer Firm filed Claim No. 4-1 on behalf of Global asserting a secured claim in the amount of $765,296.62 based upon the Default Judgment amount of $763,157 and $2,139.62 of prepetition interest. Global attached to Claim No. 4-1 a copy of the Default Judgment, an itemized statement of interest, an abstract of the Default Judgment, and the Execution Judgment.

### D.    Claim No. 4-2.

Subsequently, on November 11, 2011, the Fellheimer Firm filed Claim No. 4-2 noting on the face of the proof of claim that it was an amendment to Claim No. 4-1. Claim No. 4-2 asserted the same secured claim in the amount of $765,296 based upon the Default Judgment and prepetition interest as set forth in Claim No. 4-1. Attached to Claim No. 4-2 were (1) an Amended Retainer Agreement dated May 13, 2010 between Holzer, as managing member of Global, and the Fellheimer Firm and (2) an explanatory note that under the Amended Retainer Agreement, Global agreed to pay the Fellheimer Firm 40% of any recovery received by Global arising out of its dispute with the Debtor, less the $25,000 retainer Global paid to the Fellheimer Firm. The Fellheimer Firm had previously applied the entire $25,000 retainer to the fees owed by Global; so, the Fellheimer Firm requested that all proceeds to which Global is entitled under Claim 4-2 be disbursed jointly to the Fellheimer Firm and Global.

In the meantime, by order dated May 2, 2012, the District Court dismissed the Global Fraudulent Conveyance Action because only the Trustee, not Global, had standing post-petition to commence

fraudulent conveyance actions seeking a recovery of the Debtor's property from third parties on behalf of the Debtor's bankruptcy estate.[3]

Global subsequently terminated the services of the Fellheimer Firm. Holzer, Global and the Fellheimer Firm entered into a Mutual Release dated May 24, 2012 whereby the Fellheimer Firm agreed to send Global the executed assignment of the amended proof of claim (i.e., Claim No. 4-2) with a check for $5,000, and Holzer, Global and the Fellheimer Firm would thereby mutually release each other of and from any and all actions, suits, debts, claims, etc. Global subsequently retained the Law Office of Morse Geller, which filed a notice of appearance with the Court on July 11, 2012 [*dkt no. 232*]. On August 22, 2012, a Consent to Change Attorney [*dkt. no. 257*] was executed, which substituted Marjory Cajoux, Esq. for Morse Geller as Global's attorney.

### E.    Claim No. 27.

On October 12, 2012, Global, by and through The Law Offices of Marjory Cajoux, filed Claim No. 27 which asserts a secured claim in the amount of $763,157 plus interest as per 28 U.S.C. § 1961 on account of the Default Judgment. Claim No. 27 also asserts that under section 507(a)(7) of the Bankruptcy Code, the debt owed to Global is entitled to a priority in payment for "approximately 1,765 appraisals at approximately $450.00 per each customer." Global did not attach any supporting documentation to Claim No. 27.

## II.    Global's Claims Allowance Motion.

At some point, Global terminated the services of Marjory Cajoux and retained Douglas M. Clemmons. Mr. Clemmons did not file a notice of appearance or any other papers with the Court. It was subsequently revealed that Mr. Clemmons was not admitted to practice in the Eastern District of New York. Having failed to secure substitute counsel, Global no longer had legal representation before this Court, and Holzer proceeded to file papers in this bankruptcy case on behalf of himself and Global as its managing member.

---

[3] There is disagreement as to whether the Global Fraudulent Conveyance Action was dismissed with or without prejudice. However, such distinction is not relevant to the determination of this matter.

Even though the Trustee has not made any distribution to creditors of the Debtor's bankruptcy estate, Holzer, individually and on behalf of Global, filed the Claims Allowance Motion on April 22, 2014 seeking (i) to lift the automatic stay and have Claim No. 4-1 paid immediately as either a secured claim or an administrative expense claim, (ii) to have $25,000 of legal expenses Global incurred to the Fellheimer Firm be reimbursed as an administrative expense under 11 U.S.C. § 503(b), and (iii) to have the Trustee and his professionals removed for alleged conflicts of interest. Although the Claims Allowance Motion only mentions Claim No. 4-1, the Court will address Claim No. 4-2 and Claim No. 27 as they were filed on behalf of Global, have not been withdrawn and are the subject of the Trustee's Claims Objection Motion.

Global describes Claim No. 4-1 as being both secured and a claim entitled to priority in payment as an administrative expense of this bankruptcy case. Global avers that Claim No. 4-1 is secured under "Federal Mortgage Law," which according to Global, includes, among others, the Truth In Lending Act, the Dodd Frank Act, the HUD Lender Guide Valuations Chapter 4, the Fraud Enforcement and Recovery Act of 2009, and the Uniform Standards of Professional Appraisal Practice ("USPAP"). Global contends that "Federal Mortgage Law" mandates that appraisal fees be paid, failing which constitutes appraisal fraud. Global asserts that it is also entitled to an administrative expense under section 503(b)(3)(B) of the Bankruptcy Code as a result of its litigation against the Debtor in the Global Action and against the Debtor's officers in the Global Fraudulent Conveyance Action. Global argues that, as a direct result of such litigation, Global made a "material contribution" for the benefit of the estate. It also contends that "Global limited creditor losses while the Debtor was operating, and to date, Global recovered in excess of one million dollars in property that was concealed by the Debtor and fraudulently transferred by its former officers." *Claims Allowance Motion*, at 5. This recovery supposedly stems from the Fellheimer Firm's turnover to the Trustee, pursuant to a subpoena issued under a Bankruptcy Rule 2004 order of the Court, the Debtor's bank statements that the Fellheimer Firm obtained in seeking to enforce the Default Judgment. Accordingly, Global demands that its Claim No. 4-1 and the $25,000 retainer Global paid to the Fellheimer Firm be paid immediately. In addition, Global asserts that by reason of its pre-bankruptcy

7

litigation and contribution, the Debtor's former officers, Ashley and Helene DeCillis, have been charged with a criminal offense and that Global's claim is, therefore, entitled to a priority in payment as an administrative expense under section 503(b)(3)(C) of the Bankruptcy Code.

Global also argues that an executory contract exists between the Debtor and Global and because appraisals are required to be paid under "Federal Mortgage Law," the Trustee is statutorily required to assume such contract under section 365 of the Bankruptcy Code. Global contends that upon assumption of its executory contract, all obligations of the Debtor under such contract and Claim No. 4-1 should be paid in full immediately. Global alleges that the Trustee deliberately failed to assume Global's purported executory contract so that the fees of the Trustee and his professionals would be paid ahead of Global's claim. Global accuses the Trustee and his special litigation counsel of being incompetent and conflicted by seeking to have their fees paid first. Global argues that the failure of the Trustee and his professionals to disclose such conflict warrants their removal from this bankruptcy case.

Finally, Global argues that the "[a]llowance of the Global claim as an administrative expense will enable the estate to avoid new litigation by the borrowers of the underlying mortgages that will arise as a direct result of Global placing liens on their properties that will result if the claim is not allowed." *Claims Allowance Motion*, at 3. Furthermore, as a *quid pro quo* for allowance of Global's claim as an administrative expense, "the estate will benefit from specific data that Global has that will aid the creditors in their most reasonable path to full recovery." *Id.* Global asserts that the specific data it possess would enable the Trustee to bring an action against HUD.

This bankruptcy case was subsequently assigned to this Court due to the retirement of Judge Eisenberg. On June 2, 2014, the Trustee filed an objection to the Claims Allowance Motion (the "Trustee's Objection") [*dkt. no. 356*]. By this objection, the Trustee asserts that (1) Claim No. 27 is a prepetition money judgment, and is, at best, a disputed, general unsecured claim because the Default Judgment is not secured by any consensual lien or judgment lien recorded against the Debtor's assets, and (2) there is nothing in the "Federal Mortgage Law" that indicates that Claim No. 27 is secured or entitled to administrative expense priority status pursuant to 11 U.S.C. §§ 503 and 507. The Trustee points out

that the Default Judgment was only recorded in New York's Suffolk County where the Debtor does not own or maintain real or personal property for which the Default Judgment can attach. Further, the Trustee asserts that cash proceeds recovered during the administration of the Debtor's estate were from: (i) the sale of certain real property located in New York's Queens County; (ii) cash settlements of claims that the Debtor's estate held against certain borrowers for which the Debtor was the mortgagee of record; (iii) cash settlements of certain adversary proceedings commenced by the Trustee against third parties; and (iv) the turnover of monies maintained in certain Debtor bank accounts. None of these proceeds, the Trustee argues, were derived from the liquidation or other disposition of any assets that served as collateral for the Default Judgment.

### III.    Trustee's Claims Objection Motion.

On June 6, 2014, the Trustee filed the Claims Objection Motion seeking (1) to expunge Claims No. 4-1 and No. 4-2 because they were superseded by Claim No. 27, and (2) to reclassify Claim No. 27 from a secured claim to a general unsecured claim for the same reasons set forth in the Trustee's Objection to the Claims Allowance Motion. In addition to his substantive arguments concerning his objection to Global's Proofs of Claim, the Trustee noted that Global, as a corporate entity, did not have standing to bring the Claims Allowance Motion *pro se* and was required to retain legal counsel to move for relief before the Court.

On June 10, 2014, Global filed a *Notice of Transfer of Claim Other Than For Security* (the "Claim Assignment Notice") [*dkt. no. 362*] in which Global allegedly transferred Claim No. 4-2 to Holzer, presumably seeking to circumvent the requirement that a corporate entity appear in court through legal counsel.

On June 19, 2014, Global filed its opposition [*dkt. no. 373*] to the Trustee's Claims Objection Motion. The opposition reiterated Global's arguments that its claim for unpaid appraisals must be paid immediately and that the Trustee and his special litigation counsel should be removed.

The Court held an extended initial hearing on the Claims Motions on July 22, 2014 (the "July 22 Hearing"). At the end of the July 22 Hearing, Global requested an opportunity to offer evidence at a

continued hearing.  The Court scheduled an evidentiary hearing for August 8, 2014 (the "Aug. 8 Hearing", together with the July 22 Hearing, the "Hearings") and directed the parties to exchange the exhibits they intended to offer in evidence and a witness list so that the exhibits and the witness list are received by the opposing party no later than Friday, August 1, 2014.  Global deposited documents with Federal Express in Florida on July 30, 2014.  While the Court received the exhibits on July 31, 2014, the Trustee's counsel did not receive the exhibits until Aug. 5, 2014 because Global chose a delivery option that would have the exhibits delivered to the Trustee's counsel in three business days, which ensured that the exhibits would arrive after the August 1 deadline.

At the Aug. 8 Hearing, the Trustee lodged two objections to the admissibility of Global's exhibits.  First, the Trustee argued that the exhibits were received by his counsel four days after the August 1, 2014 deadline in violation of the Court directive, and should be excluded on that ground alone.  Second, with the exception of one exhibit titled "original Global complaint for 'breach of contract,'" the Trustee objected to the admission of Global's exhibits because they (a) refer to purported legal authorities, which are not evidence; (b) are irrelevant to the issue of whether Global's claim against the estate is a secured claim or an administrative expense priority claim; and/or (c) are hearsay and do not fall under any exception to the hearsay rule under Fed. R. Evid. 803.  After hearing the parties and considering each of the objections lodged by the Trustee, and for the reasons expressed on the record of the Aug. 8 Hearing, the Court admitted substantially all of the exhibits Global sought to introduce in evidence.

The Court heard extensive oral argument from the Trustee's counsel and Holzer on behalf of Global at the July 22 Hearing which lasted five hours and at the Aug. 8 Hearing which lasted approximately one and a half hours.  While, at first glance, the Claims Motions appear to be routine, that is not the case as they raise a myriad of issues with respect to the treatment of the Global Proofs of Claim. In deciding how each of the Global Proofs of Claim shall be treated in this bankruptcy case,  the Court considered, among other things: (a) whether Global and Holzer had standing to file the Claims Allowance Motion; (b) whether Global has a secured claim against the Debtor's estate by reason of the Default

Judgment; (c) whether Global has an administrative expense priority claim against the Debtor's estate by reason of its alleged substantial contribution to the Debtor's estate; (e) whether an executory contract exists between the Debtor and Global and how such contract, to the extent one exists, is treated under the Bankruptcy Code; (f) Global's assertion that "Federal Mortgage Law" is controlling authority on the treatment and classification of the Global Proofs of Claim for purposes of distribution of property of the bankruptcy estate; (g) whether the automatic stay should be lifted, *inter alia*, to permit enforcement of the Default Judgment; and (h) whether cause exists to remove the Trustee and his special litigation counsel.

## DISCUSSION

I.    **Standing.**

Before the Court addresses the merits of the Claims Motions, it must first determine (1) whether Global, as a limited liability company, may appear without legal representation in this Court, and (2) whether Holzer may appear before the Court with respect to the Claims Motions on behalf of himself and Global.

A.    **Whether Global Has Standing.**

Appearances in federal court are governed by 28 U.S.C. § 1654, which provides "[i]n all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct such causes therein." 28 U.S.C. § 1654. Courts have held that section 1654 permits only two types of representations in the federal courts: "that by an attorney admitted to the practice of law by a governmental regulatory body and that by a person representing himself. The statute does not allow for unlicensed laymen to represent anyone else other than themselves." *Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1308 (2d Cir. 1991) (*quoting Turner v. American Bar Ass'n*, 407 F. Supp. 451, 477 (N.D. Tex. 1975), *aff'd sub. nom. Pilla v. American Bar Ass'n*, 542 F.2d 56 (8th Cir. 1976)); *Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007). It is well established that all artificial entities such as corporations, partnerships, and limited liability companies, which are hybrids of corporations and partnerships, may only appear through legal counsel. *Lattanzio*, 481 F.3d. at 139-40. *See also Rowland v. California Men's Colony*, 506 U.S. 194 (1993)

11

(holding that a corporation must be represented by counsel); *Eagle Assocs.*, 926 F.2d at 1310 (holding that the district court properly prohibited a partnership from appearing through a layperson); *Bijan-Sara Corp. v. Federal Deposit Ins. Corp. (In re Bijan-Sara Corp.)*, 203 B.R. 358 (B.A.P. 2d Cir. 1996) (holding that corporate debtor would not be allowed to appear through its non-debtor principal). The rationale for requiring artificial entities to litigate only through an attorney is that "the conduct of litigation by a nonlawyer creates unusual burdens not only for the party he represents but as well for his adversaries and the court." *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983).

Thus, Global, as a limited liability company, may not appear in this bankruptcy case other than through an attorney. The Claims Allowance Motion and related pleadings and objections to the Trustee's Claims Objection Motion were filed by Holzer on behalf of himself and Global. There is no evidence that Global has retained substitute legal counsel to represent its interests before the Court nor has legal counsel made an appearance in this Court on behalf of Global with respect to the Claims Objection Motion or any pleading filed thereafter by Global.

**B.    Whether Holzer Has Standing.**

While Global sought to remedy its lack of counsel by filing the Claims Assignment Notice with the Court purporting to assign Claim No. 4-2 to Holzer, the alleged claim assignment is ineffective under the Bankruptcy Rules. Where there has been an assignment of a claim, Bankruptcy Rule 3001(e)(2) requires that:

> [i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed, evidence of the transfer shall be filed by the transferee. The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of the transfer and that objection thereto, if any, must be filed within 21 days of the mailing of the notice or within any additional time allowed by the court. If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.

Fed. R. Bankr. P. 3001(e)(2).  In this case, Holzer, the purposed transferee, failed to file a *Transfer of Claim Other Than For Security* form and any evidence demonstrating that Claim 4-2, or the Default Judgment upon which it is based, has been transferred from Global to him.  The *Notice of Transfer of Claim Other Than For Security*, i.e., the Claim Assignment Notice, filed by Holzer is the form notice typically given by the Clerk's Office, and not by claimants, pursuant to Bankruptcy Rule 3001(e)(2) to notify the original claimant that if an objection is not filed within 21 days, the transferee would be substituted as the original claimant without further order of the court.  As Holzer never filed any evidence demonstrating that Claim 4-2 or the Default Judgment has been transferred by Global, the Clerk's Office did not issue a *Notice of Transfer of Claim Other Than For Security*.  Indeed, the Claim Assignment Notice filed by Holzer purporting to evidence the claim assignment is neither signed nor dated by the Clerk of the Court, and it alone is insufficient to effectuate a transfer of Claim No. 4-2.  Without the required documentation evidencing that Claim No. 4-2 has been transferred to Holzer as required under Bankruptcy Rule 3001(e)(2), Global is still regarded as the holder of Claim No. 4-2 in this bankruptcy proceeding.

Even if Global had properly assigned its claim against the bankruptcy estate to Holzer, the assignment would not accord Holzer the right to appear on behalf of Global.  In light of the policy reasons for prohibiting artificial entities from appearing *pro se*, "the federal courts have, in cases governed by federal law, disapproved any circumvention of the rule by the procedural device of an assignment of the corporation's claims to the lay individual," especially when the assignment was made solely to permit the assignee to conduct the litigation.  *Jones*, 722 F.2d at 23 (affirming dismissal of a motion to amend the complaint by a corporate entity who sought to assert its claim in the name of its chief executive officer and sole shareholder to whom it assigned its claim).  *See also Sanchez v. Walentin*, 526 Fed. Appx. 49, 51 (2d Cir. 2013); *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997) (stating that a layperson cannot assert a claim that has been assigned by a corporation because "[an] appearance pro se denotes (in law latin) appearance for one's self; so that a person ordinarily may not appear pro se in the cause of another person or entity").

13

Courts in the Second Circuit have found that:

> [t]o allow [the layperson] to appear *pro se* in this suit would be allowing him to flout a well-established and purposeful public policy by means of a procedural device. [The layperson] chose to accept the advantages of incorporation and must now bear the burdens of that incorporation; thus, he must have an attorney present the corporation's legal claims.

*Jones*, 722 F.2d at 23 (*quoting Mercu-Ray Indus., Inc. v. Bristol-Myers Co.*, 392 F. Supp. 16, 18-20 (S.D.N.Y.), *aff'd mem.*, 508 F.2d 837 (2d Cir. 1974)). This restriction for corporations extends also to limited liability companies in that "a sole member of a limited liability company must bear the burdens that accompany the benefits of the corporate form and may appear in federal court only through a licensed attorney." *Lattanzio*, 481 F.3d at 140.

Accordingly, even assuming the Claim Assignment was properly executed and is valid and enforceable, Holzer cannot, as Global's managing member, appear on behalf of Global in this Court to prosecute the Claims Allowance Motion or to oppose the Claims Objection Motion. Nor can Holzer appear individually and on behalf of himself to advocate for the allowance of the Global Proofs of Claim since the Global Proofs of Claim and the Default Judgment upon which they are based belong to Global, not Holzer. Thus, for this reason alone, sufficient grounds exist to deny the Claims Allowance Motion. *Lattanzio*, 481 F.3d at 140 (denying *pro se* limited liability company's motion to reinstate an appeal without prejudice to renewal if the company retains legal counsel within a limited period of time, but denying motion of the company's director to reinstate the same appeal with prejudice).

The Court will nevertheless address the merits of the Claims Motions given one, the contentious nature of this proceeding, and two, the likelihood that Global, despite the apparent legal obstacles, will endeavor to effectuate a transfer of the Global Proofs of Claim and thereafter refile the Claims Allowance Motion.

## II.    The Claims Motions[4].

### A.    General.

Generally, a claim for which a proof of claim is filed is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). Such proof of claim constitutes *prima facie* evidence of the validity and amount of the claim if the proof of claim was executed and filed in accordance with the Bankruptcy Rules. Fed. R. Bankr. P. 3001(f). The claimant must allege facts sufficient to support the claim and attach supporting documentation to a proof of claim. *In re Aiolova*, No. 11-10503, 2013 Bankr. LEXIS 4504, at *5-6 (Bankr. S.D.N.Y. Oct. 29, 2013). Bankruptcy Rule 3001(c) provides that "[w]hen a claim, or an interest in property of the debtor securing the claim, is based on a writing, a copy of the writing shall be filed with the proof of claim." Fed. R. Bankr. P. 3001(c)(1). "If a proof of claim is not supported by the requisite documentation, it is not presumed to be *prima facie* valid." *Aiolova*, 2013 Bankr. LEXIS 4504, at *7. *See also In re Minbatiwalla*, 424 B.R. 104, 112 (Bankr. S.D.N.Y. 2010) (stating that "[f]ailure to attach the documentation required by Rule 3001 will result in the loss of the *prima facie* validity of the claim.")

]The party objecting to the proof of claim has the burden of going forward with sufficient evidence (i) to rebut the validity or amount of the claim asserted or (ii) to show the claim should be disallowed. *Id.*, 2013 Bankr. LEXIS 4504, at *6; *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 540 (S.D.N.Y. 2001). Once the objecting party succeeds in overcoming the *prima facie* effect given to a proof of claim, the burden shifts back to the claimant to provide support for the validity of its claim by preponderance of the evidence that the claim should be allowed under applicable law. *Aiolova*, 2013 Bankr. LEXIS 4504, at *7-8; *In re Residential Capital, LLC*, No. 12-12020, 2014 Bankr. LEXIS 481, at *10 (Bankr. S.D.N.Y. 2014). "The ultimate burden of proof, however, always lies with the claimant." *In re Taranto,* No. 10-76041, 2012 Bankr. LEXIS 1320, at *18 (Bankr. E.D.N.Y. Mar. 27, 2012); *Primavera Familienstifung*, 130 F. Supp. 2d at 540.

---

[4] To the extent that an argument was raised in the Claims Allowance Motion and is not addressed in this Memorandum Decision, it is because the Court considered such argument and finds it to be not well taken for the determination of this matter.

B.      **Claims No. 4-1 and 4-2.**

In the Claims Objection Motion, the Trustee seeks to disallow and expunge Claims No. 4-1 and 4-2 filed on behalf of Global on the basis that these claims have been amended and superseded by Claim No. 27.  Claims that are amended and superseded by subsequent claims filed by the same creditor are routinely disallowed and expunged.  *See, e.g., In re Enron Corp.*, No. 01-16034, 2005 Bankr. LEXIS 3468, at *2 n.1 (Bankr. S.D.N.Y. Oct. 5, 2005) (noting that "[i]n as much as the Initial Claim was amended and superseded by the Amended Claim, it was disallowed and expunged . . . ").  The rationale is that a creditor is not entitled to multiple recoveries for the same injury, debt or claim.  *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993) (citing *LTV Corp. v. Pension Benefit Guar. Corp. (In re Chateaugay Corp.)*, 115 B.R. 760, 783-784 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 690, 698 (S.D.N.Y. 1991)); *In re Cluff*, 313 B.R. 323, 337 (Bankr. D. Utah 2004) (noting there are certain legal and statutory objections which are sufficient to disallow a claim, such as objections to duplicative claims because a claimant does not have a right to payment of its claim twice).  Thus, a debtor or trustee may seek the disallowance of a proof of claim that has been amended and/or superseded by a later filed proof of claim for the same injury, debt or claim against the bankruptcy estate.

Here, the face of Claim No. 4-2 had the box checked indicating that it was expressly amending a previously filed claim (i.e., Claim No. 4-1).  Therefore, Claim No. 4-2 supersedes Claim No. 4-1, and Claim No. 4-1 shall be disallowed and expunged from the Court's Claims Register.  Although Claim No. 27 does not specifically check the box on the face of the form noting that it amends a prior proof of claim, Claim No. 27 asserts a claim based upon the same Default Judgment upon which Claim No. 4-2 is based, with the exception of the contingency legal fees claimed by the Fellheimer Firm.  Because Claim No. 27 is the most recent claim filed on behalf of Global and asserts the same debt or claim as asserted in Claim No. 4-2, it is deemed to amend and supersede Claim No. 4-2.  Accordingly, Claim No. 4-2 shall also be disallowed and expunged from the Court's Claims Register.

C.      **Classification of Claim No. 27.**

1.      **Whether Claim No. 27 Is A Secured Claim.**

As to Claim No. 27, at issue is the appropriate classification of this lone surviving claim.  Global asserts that Claim No. 27 should be paid immediately as a secured claim and as a claim entitled to administrative expense priority.  Global uses the term "secured" and "administrative priority" interchangeably, but these terms are not synonymous.

In bankruptcy, an allowed claim of a creditor is "secured" if such claim is "secured by a lien on property in which the estate has an interest." 11 U.S.C. § 506(a)(1).  Furthermore, such a claim is only secured to the extent of the value of such creditor's interest in the estate's interest in such property; otherwise, such creditor has "an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." *Id.*  For example, if a creditor is owed $100 and has a lien on the debtor's real property and that real property is valued at $60, then the creditor has a secured claim of $60 and a $40 unsecured claim.  An administrative expense claim, on the other hand, is unsecured, albeit entitled to one of the higher levels of priority in payment under the Bankruptcy Code.  By arguing that its claim is an administrative expense, Global essentially concedes that it does not have a secured claim.

Notwithstanding Global's reference to Claim No. 27 as an administrative expense claim in its papers, Claim No. 27 on its face asserts a secured claim arising out of the Default Judgment.  In order for a proof of claim for a secured claim to be *prima facie* valid, Bankruptcy Rule 3001(d) mandates that "[i]f a security interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected." Fed. R. Bankr. P 3001(d).  The term "security interest" as defined under the Bankruptcy Code means a "lien created by an agreement." 11 U.S.C. § 101(51).  In determining whether a creditor's security interest or judgment lien is perfected, courts look to state law. *In re Milton Abeles, LLC*, No. 12-70158, 2013 Bankr. LEXIS 3932, at *9 (Bankr. E.D.N.Y. Sept. 20, 2013) (*citing Butner v. United States*, 440 U.S. 48, 55 (1979)).  In New York, a lien created by an agreement typically takes the form of a recorded consensual mortgage with respect to a debtor's real

17

property or a security agreement governed by Article 9 of the New York Uniform Commercial Code with respect to a debtor's personal property.

Alternatively, a creditor may have a secured claim against a bankruptcy estate in the form of an involuntary, judicial lien.  Pursuant to section 101(36) of the Bankruptcy Code, the term "judicial lien" means a "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding."  11 U.S.C. § 101(36).  Under New York law, "[o]nce docketed, a judgment becomes a lien on the real property of the debtor in that county." *Schiff Food Prods., Co., Inc. v. M & M Imp. Exp.*, 84 A.D.3d 1346 (N.Y. App. Div. 2011) (*quoting Matter of Soressi v. SWF, L.P.*, 81 A.D.3d 1142, 1144 (N.Y. App. Div. 2011).  *See also* N.Y. C.P.L.R. § 5018(a); *1256 Hertel Ave. Assocs., LLC v. Calloway*, 751 F.3d 252, 262 n.6 (2d Cir. 2014).  Where a money judgment is rendered by a federal court in New York, a transcript of the federal judgment may be filed in the clerk's office of any county and such transcript may be docketed in the same matter and with the same effect as a judgment entered in the state supreme court within the county.  N.Y. C.P.L.R. § 5018(b).  A money judgment so docketed with the county clerk's office, has priority over subsequent transferees with respect to the judgment debtor's real property located in that county.  N.Y. C.P.L.R. § 5203(a).  *See also 1256 Hertel Ave. Assocs., LLC*, 761 F.3d at 262-63.  Unless the judgment or a transcript of the judgment is docketed in the county within New York where the judgment debtor has real property, the judgment doesn't attach to the debtor's real property in that county.  *In re Sterling Die Casting Co., Inc.*, 126 B.R. 673, 677 (Bankr. E.D.N.Y. 1991) (concluding that under New York law, a federal judgment must be docketed in the clerk's office of a county before it obtains the status of a judgment lien on the judgment debtor's real property in that county; otherwise, an undocketed judgment may place innocent parties at risk where they are unaware of the existence of liens not recorded in the county where the land was situated).

Similarly, with respect to personal property, a judgment creditor may seek to levy upon any interest of the judgment debtor by delivering to the sheriff a writ of execution which orders the sheriff to look for property of the judgment debtor, to seize it, to sell it, and to pay the proceeds to the judgment debtor.  N.Y. C.P.L.R. § 5232(a).  However, at the expiration of the 90 days after a levy is made by the

sheriff, the levy becomes void except as to any property which has already been transferred.  *Id.*

Thus, the judgment itself does not give the judgment creditor an interest in the judgment debtor's property, nor does it accord priority in any of the judgment debtor's property or income.  The judgment creditor remains unsecured until either "execution" is obtained on the judgment or a judgment lien against real property is obtained by recording the judgment in the county in which the judgment debtor owns real property.

Claim No. 27 does not include any agreement or supporting documents that would evidence the existence of a lien or security interest in the Debtor's property.  Therefore, Claim No. 27 is not presumed to be *prima facie* valid under Bankruptcy Rule 3001 and Global must present evidence of a lien or security interest in the Debtor's property in response to the Trustee's objection to its claim.  *Aiolova*, 2013 Bankr. LEXIS 4504, at *7; *Minbatiwalla*, 424 B.R. at 112 (finding a creditor's failure to attach documentation to its claim and failure to respond to the Debtor's information requests is fatal to its claim).

Even if the Court were to consider the copy of the Default Judgment and the Execution Judgment that were attached to Claim No. 4-1 or the papers Global filed in support of its Claims Allowance Motion as somehow being incorporated as part of Claim No. 27 and Claim No. 27 is thus presumed to be *prima facie* valid, the Trustee has successfully rebutted the presumption as there is no evidence before the Court (i) that the Debtor granted to Global a lien on any of its assets as collateral security for obligations arising from appraisal services rendered by Global or (ii) that a judicial lien attached to any of the Debtor's assets.   There is no evidence that the Default Judgment or the Execution Judgment resulted in a lien that attached to the Debtor's assets under state law.  While the docketing of a judgment does create a lien in New York, in order for such lien to attach to the Debtor's real property, the Default Judgment needed to be docketed in the county where the Debtor's real property was located.  The Debtor did not have any interest in real property located in Suffolk County, and there is no evidence that any lien that may arise from the docketing of the Default Judgment in Suffolk County was perfected against or attached to the Debtor's interest in real property outside of Suffolk County, such as Queens County where the Trustee

located real property in which the Debtor had an interest.  The failure to docket a transcript of the Default Judgment in any other county meant that the Default Judgment could not attach to any real property the Debtor may have had in those other counties.  In addition, while Global did seek to levy against the Debtor's personal property in Suffolk County, the writ of execution was return unsatisfied.

To overcome this lack of evidence, Global contends that its claim is secured based upon "Federal Mortgage Law", which requires appraisals to be paid.  The Court need not look to "Federal Mortgage Law" to determine whether Global is entitled to payment as Global's right to payment has been reduced to a judgment.[5]  However, the right to payment is an issue separate from whether Claim No. 27, to the extent it is an allowed claim, is (i) secured and thus will receive the value of its collateral, or (ii) unsecured and entitled to a priority in payment.  All creditors who have allowed claims against a bankruptcy estate have a right to payment of their claims regardless of whether the claims are secured, priority or general unsecured.  Global has a claim, i.e., a right to payment, arising out of the Default Judgment.  11 U.S.C. § 101(5).  What the Court must decide is whether Global is entitled to receive payment from the Debtor's estate on account of the Default Judgment as a secured creditor.  The Court concludes it is not.  There is nothing in the record, including entry of the Default Judgment that persuades the Court that all or any portion of Claim No. 27 is secured.

Courts have disallowed or reclassified secured claims purportedly arising from default judgments based on vague testimony and little documentation.  *See, e.g.*, *In re Blixseth*, 489 B.R. 154, 202 (Bankr. D. Mont. 2013) (finding a creditor had only a general unsecured claim where no detailed accounting attached to its proof of claim and there was no evidence of its security interest).  Similarly, courts routinely reclassify a secured claim as a general unsecured claim where no basis exists for secured classification or when a claimant fails to attach documentation evidencing the existence of a security interest to its proof of claim.  *In re Cruse*, No. 12-8154-RLM-13, 2013 Bankr. LEXIS 360, at * 6-7 (Bankr. S.D. Ind. Jan. 28, 2013) (holding that claimant had an unsecured claim where the proof of claim

---

[5] The Trustee disputes the amount of the payment to which Global is entitled but that issue is not currently before the Court.

contained no supporting documentation of a lien, written security interest, or a record of the filing of a financing statement). Based upon the foregoing, the Court concludes that the Claim No. 27 must be reclassified as an unsecured claim. The only remaining question then is whether as an unsecured claim it is entitled to priority under 11 U.S.C. § 507(a).

### 2.    Whether Global Has A Section 507(a) Priority Claim.

Contrary to Global's contentions,  the order of distribution among creditors, particularly in a chapter 7 case, is determined not by "Federal Mortgage Law", the USPAP, or even state law, but by the Bankruptcy Code.  11 U.S.C. §§ 503, 507, 510, 724, and 726.  *See also Northwest Fin. Exp., Inc. v. JWD, Inc. (In re Northwest Fin. Exp., Inc.),* 950 F.2d 561, 563 (8th Cir. 1991) (stating that bankruptcy priorities are determined by the Bankruptcy Code.)  With respect to property of the estate that is not subject to a security interest or judgment lien, section 726 of the Bankruptcy Code, which dictates the distribution scheme among creditors in a chapter 7 case, mandates that such unencumbered property, or the proceeds thereof, shall be distributed first to claims having priority under section 507(a) of the Bankruptcy Code and before distribution is made in respect of allowed general unsecured claims.  11 U.S.C. §§ 726(a)(1). Section 507(a) enumerates ten categories of allowed unsecured claims that are entitled to priority in payment.  Each category must be first paid in full before the next category can receive payment.  11 U.S.C. §§ 507(a)(1) – (10).

### a.    Section 507(a)(2) Administrative Expense Priority.

Section 507(a)(2) of the Bankruptcy Code provides that administrative expenses allowed under section 503(b) are accorded a second priority after the payment of allowed unsecured claims for domestic support obligations.  11 U.S.C. § 507(a)(2).  While the term "administrative expense" is not defined under the Bankruptcy Code, section 503(b) sets forth nine categories of the type of expenses that are granted administrative expense priority.  Although these nine categories cover different types of expenses, these expenses commonly are incurred postpetition by the bankruptcy estate.  *In re Norwalk Furniture Corp.*, 418 B.R. 631, 633 (Bankr. N.D. Ohio 2009) (explaining that "an administrative expense may be defined as a cost incurred by the bankruptcy estate after the commencement of the bankruptcy case.")

If there are insufficient funds to pay in full all claims within a category of priority claims, the claims in that category receive a *pro rata* distribution and no subordinate category will receive a distribution.  11 U.S.C. §§ 726(b) and 507(a).  If the estate has enough assets to pay all section 507(a) priority claims in full, then distribution will be made *pro rata* among the general unsecured creditors.  *In re Swann*, 149 B.R. 137, 145 (Bankr. D.S.D. 1993).  As a practical matter, whether any of these creditors' allowed claims actually gets paid in bankruptcy depends on how much money is generated from the trustee's recovery and liquidation of assets, and the costs incurred in administrating the bankruptcy estate.

The creditor has the burden of proof on the issue of whether it is entitled to an administrative expense.  *In re Patient Educ. Media, Inc.*, 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998).  Of the nine categories of administrative expenses under section 503(b) of the Bankruptcy Code that Congress determined are entitled to priority, the following have been either asserted directly or indirectly by Global in its Claims Allowance Motion.  Section 503(b) states in pertinent part:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, *including* –
>
> (1) (A) the actual, necessary costs and expenses of preserving the estate
>
> …
>
> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by –
> > (B) a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;
> > (C) a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;
> > (D) a creditor … in making a substantial contribution in a case under chapter 9 or 11 of this title.

11 U.S.C. § 503(b) (emphasis added).

Global contends that its prepetition claim should be given priority in payment as an administrative expense priority under section 503(b) of the Bankruptcy Code because Global made a substantial contribution to the estate.  Global asserts that its substantial contribution consists of (a) it having brought a fraudulent conveyance action against Ashley prior to the commencement of the

bankruptcy case which led to the settlement of the Trustee's fraudulent conveyance action against Ashley and other defendants for $1,000,000, (b) Global's pre-bankruptcy litigation against the Debtor and its officers resulted in criminal charges brought against Ashley and Helene DeCillis, the Debtor's chief operating officer, and (c) the use by the Trustee of appraisals Global provided to the Debtor prior to the commencement of the bankruptcy case to close on mortgage transactions that were pending on the Petition Date.  In addition, Global contends that it is entitled to have the $25,000 retainer it paid to the Fellheimer Firm allowed as an administrative expense because the Fellheimer Firm turned over copies of the Debtor's bank statements to the Trustee that it had obtained during its representation of Global in litigation against the Debtor and its officers.

### (1)    Section 503(b)(1)(A) Expenses in Preserving the Estate.

To be entitled to an administrative expense priority for "the actual, necessary costs and expenses of preserving the estate" under 11 U.S.C. § 503(b)(1)(A), the creditor must demonstrate that (1) its claim arose from a transaction with or on account of consideration furnished to the debtor, and (2) the transaction or consideration directly benefitted the debtor.  *In re Patient Educ. Media, Inc.*, 221 B.R. at 101.  "A clear relationship between the expenditures made and the benefit conferred on the estate must therefore be shown."  *In re Drexel Burnham Lambert Group Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991); *In re Keegan Utility Contractors, Inc.*, 70 B.R. 87, 89 (Bankr. W.D.N.Y. 1987).  This subsection reinforces the concept that the expenses incurred in "preserving the estate" must have been incurred postpetition and conferred a benefit to the bankruptcy estate as no bankruptcy estate existed prior to the commencement of the case.  As Claim No. 27 is based upon the failure of the Debtor to pay Global's prepetition invoices which resulted in the Default Judgment, Claim No. 27 is not an expense incurred in connection with the postpetition administration of the bankruptcy estate.  The unpaid invoices did not arise from a transaction with or on account of consideration furnished by Global to the bankruptcy estate, rather the transactions giving rise to any obligation of the Debtor to Global and the entry of the Default Judgment occurred prepetition.

In addition, Global has not submitted any evidence that its appraisals conferred a benefit to the

bankruptcy estate.  Global contends that the Trustee used appraisals completed prepetition by Global's network of appraisers in order to close on mortgages and administer other assets of the estate, and thus the cost of the appraisals was an actual, necessary cost of preserving the bankruptcy estate.  However, there is no evidence that the Trustee actually used any of the appraisals that were ordered through Global.  Global was one of five vendors that provided appraisals to the Debtor.  To the extent the Trustee did use prepetition appraisals prepared by Global, Global has not demonstrated (i) which appraisals were used by the Trustee to close on mortgage transactions that were pending on the Petition Date or to value property of the Debtor, (ii) that Global was not paid for those specific appraisals, (iii) the unpaid Global appraisals actually led to the recovery or preservation of property for the estate, (iv) the amount by which the estate benefitted from the use of those appraisals, and (v) the cost or value of those appraisals.  Without such proof, Global's arguments about the Trustee's use of the appraisals and the benefit such use conferred upon the bankruptcy estate are purely speculative.  A creditor must not only show that what it provided to the bankruptcy estate was used, but also that such use benefited the estate.  Where the speculative benefit is not quantifiable, the mere potential benefit does not qualify as a benefit for purposes of determining administrative expense priority status.  *In re CIS Corp.*, 142 B.R. 640, 643-44 (S.D.N.Y. 1992) (finding (i) the debtor did not derive any benefit from the postpetition sublease of a creditor's computer equipment to a third party postpetition where the debtor had already received payment for the sublease prepetition and (ii) any benefit derived from the creditor's continued lease of the equipment to the debtor and preventing the debtor from defaulting on its sublease obligation was speculative).  Accordingly, Global has not satisfied its burden of proof in demonstrating that any portion of the Default Judgment, and therefore, Claim No. 27, should be conferred priority as an administrative expense under section 503(b)(1)(A).

Similarly, Global contends that it made a substantial contribution to the estate because the Fellheimer Firm turned over to the Trustee the Debtor's Capital One bank statements the Fellheimer Firm obtained in connection with the Global Fraudulent Conveyance Action.  As such, Global argues that its legal fees should be given administrative expense priority status.  Where a creditor expended its own

funds to obtain information that a trustee would have had to incur an expense to obtain, and the information was made available to the trustee and the trustee benefited from this information, such creditor may be entitled to an administrative expense claim. *In re Pappas*, 277 B.R. 171, 179 (Bankr. E.D.N.Y. 2002) (granting an administrative expense claim where the creditor hired a licensed private investigator and obtained a title report and other documents in the chain of title regarding a parcel of real property and made such information available to the trustee, and the trustee benefitted from this information without having to incur the cost of procuring the information).

Global's argument, however, ignores the fact that the Trustee obtained an order from this Court, dated May 29, 2012, which authorized the Bankruptcy Rule 2004 examination of Holzer, and a similar order dated July 17, 2012, which authorized a Bankruptcy Rule 2004 examination of the Fellheimer Firm. The bank statements were produced pursuant to a document subpoena issued to the Fellheimer Firm pursuant to the Bankruptcy Rule 2004 order seeking any and all books or records pertaining to the Debtor and certain officers of the Debtor. Moreover, the Fellheimer Firm's turnover of the Debtor's Capital One bank statements was duplicative because the Trustee had already received the Debtor's bank records from Capital One Bank months before in response to a separate document subpoena issued pursuant to a Bankruptcy Rule 2004 order obtained by the Trustee with respect to Capital One Bank. Thus, the bank statements provided by the Fellheimer Firm did not provide any additional benefit to the estate, and the simple act of turnover of the Debtor's bank records, without more, is insufficient to demonstrate how Global made a substantial contribution to the Trustee's administration of the estate. Global has not submitted any evidence to show how Global used those bank statements to assist the Trustee in locating and/or preserving assets of the Debtor. While Global asks that the full amount of the $25,000 retainer it paid to the Fellheimer Firm be treated as an administrative expense, Global has not submitted any evidence as to the amount of legal fees it actually incurred in procuring and producing the bank statements. Thus, absent evidence of a substantial contribution, Global's argument that the full amount of the Default Judgment and the $25,000 retainer paid to the Fellheimer Firm be given administrative expense priority status under section 503(b)(3)(A) fails.

### (2)    Section 503(b)(3)(B) Expenses for Recovery of Property.

Section 503(b)(3)(B) allows as an administrative expense priority the actual, necessary expenses incurred by "a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor."  11 U.S.C. § 503(b)(3)(B).  Global asserts that its claim is entitled to priority under section 503(b)(3)(B) because Global's prepetition litigation against Ashley and Ashley related entities resulted in a favorable recovery to the bankruptcy estate.

Despite its having commenced the Global Action and Global Fraudulent Conveyance Action, Global fails to demonstrate how any expense it incurred in bringing these pre-bankruptcy litigations is entitled to administrative expense priority status under section 503(b)(3)(B).  First, since Global brought each of these actions prior to the commencement of the bankruptcy case, section 503(b)(3)(B) is not available as Global could not have obtained the Court's approval as mandated by section 503(b)(3)(B).  Second, the Global Action was concluded prepetition and resulted in entry of the Default Judgment in favor of only Global for which Claim No. 27 is based and not for the benefit of the estate.  Similarly, Global pursued the prepetition litigation against the Debtor's officers in the Global Fraudulent Conveyance Action for the sole purpose of benefitting Global in order to collect on its Default Judgment, and not for the benefit of the bankruptcy estate which did not exist at the time the action was commenced.  The Global Fraudulent Conveyance Action did not generate any assets for the bankruptcy estate, and was dismissed by the District Court pursuant to an order dated May 2, 2012 as the cause of action is one belonging to the bankruptcy estate to be pursued by the Trustee.  Thus, Global did not have any standing postpetition to pursue a fraudulent conveyance action against the Debtor's officers and any party who may have been the recipient of an avoidable transfer of the Debtor's property.  *Keene Corp. v. Coleman (In re Keene)*, 164 B.R. 844, 851 (Bankr. S.D.N.Y. 1994) (noting that with respect to claims against those who have misused the debtor's property, "[t]he Bankruptcy Code authorizes the trustee to prosecute such claims for the benefit of all creditors, and necessarily deprives individual creditors of standing to pursue the same claims for their sole benefit"); *St Paul Fire and Marine Ins. Co. v. Pepsi Co., Inc.*, 884 F.2d 688, 701-02 (2d Cir. 1989).  Accordingly, Global could not have taken any action postpetition to recover

property that was transferred or concealed by the Debtor, nor was it authorized to do so by the Court.

Rather, the $1,000,000 recovery by the estate for which Global seeks to take credit for arose out of the Trustee's own adversary proceeding, No. 12-8443 ("No. 12-8443 Action"), commenced on December 17, 2012, against Ashley, Cooper Capital Group Ltd. ("Cooper Capital") and certain other Ashley related entities (collectively, the "Ashley Defendants").  In the No. 12-8443 Action, the Trustee sought to avoid certain fraudulent transfers made by the Debtor for the benefit of the Ashley Defendants under the Bankruptcy Code and New York Debtor and Creditor Law, including the transfer of $6,752,000 to Cooper Capital for the purchase of 6,752 shares of certain preferred stock issued by Gateway Bank, FSB (the "Preferred Stock").  The Trustee and his counsel negotiated the settlement of the adversary proceeding (the "Ashley Settlement") whereby the Ashley Defendants agreed to pay $100,000 and turn over the Preferred Shares to the bankruptcy estate.  The Trustee would offer the Preferred Stock for sale, and Ashley personally guaranteed that the sale of the Preferred Stock will result in a recovery to the estate of not less than $1,000,000 or Ashley would pay the difference between the sale price of the Preferred Stock and $1,000,000.  In the event the estate did not recover at least $1,000,000 on or before April 15, 2015, from the sale of the Preferred Stock and/or the payment on account of Ashley's personal guarantee, the Trustee would be entitled to the entry of a judgment against Ashley in the amount of $2,000,000, plus costs less any sums received from the sale of the Preferred Stock.

When the Trustee sought approval of the Ashley Settlement from the Court pursuant to Bankruptcy Rule 9019 [No. 12-8443 Action, *dkt no. 19*], Global filed an objection to the Ashley Settlement on February 25, 2014 (the "Ashley Settlement Objection") [No. 12-8443 Action, *dkt. no. 20*].  The Ashley Settlement Objection included a declaration in paragraph 18.C. that:

> [d]espite the Global complaint [i.e., the Global Fraudulent Conveyance Action] having been in the public domain prior to HUD filing its original complaint against the Debtor, and despite both Trustee Barnard, through his Attorney, and the HUD attorneys to the docket having knowledge of unpaid appraisals, the statutory ramifications, and that Global has "specific knowledge" related to "the same," that the Trustee and his attorneys and HUD investigators, knowingly chose not to interview Global or include Global in its complaint against the Debtor and its officer, Ashley.

*Ashley Settlement Objection*, at 3.  Thus, by Global's own admission, the Trustee did not solicit Global's assistance nor was Global involved in the Trustee's prosecution and settlement of the No. 12-8443 Action.  Simply put, Global has not provided any evidence to support its assertion that the Global Fraudulent Conveyance Action brought about the Ashley Settlement, or how it engaged in any action and incurred any expense that resulted in any recovery to the estate under the Ashley Settlement, or otherwise.  Global's argument, therefore, that it is entitled to an administrative expense priority under section 503(b)(3)(B) fails.

**(3)    Section 503(b)(3)(C) Prosecution Expenses.**

To be entitled to an administrative expense under section 503(b)(3)(C), the moving party has the burden of proving (1) there is a direct relationship between the expenses sought and the prosecution of the criminal activity, and (2) the prosecution of the criminal offense relates to the debtor's case, business, or property.  *In re Summit Metals, Inc.*, 379 B.R. 40, 59 (Bankr. D. Del. 2007).  *See also In re Fall*, 93 B.R. 1003, 1013 (Bankr. D. Ore. 1988) (granting administrative expenses incurred postpetition by creditor where all investigations made, information revealed, litigation filed and criminal prosecution pursued by the trustee were the result of the creditor's early and forceful intervention and willingness to fund continued inquiry as the trustee did not have any funds with which to litigate, and there were little duplication of efforts by the creditor and the trustee).

Here, Global has not specified what activity it engaged in that related to the criminal investigation or proceeding against the Debtor and certain of its agents and officers.  Global merely asserts that it sued the Debtor and its officers separately in a civil action to collect on its debt.  Plainly stated, that is not sufficient to permit an administrative expense under section 503(b)(3)(C).  Global has not shown any direct relationship between the expenses it seeks to have allowed as an administrative priority and the prosecution of the criminal activity.  First, there is nothing in the record to establish that Global incurred expenses in assisting and providing evidence or testimony to any of the state or federal banking authorities in their investigation of the Debtor or that any such evidence and testimony was used by

prosecutors in their criminal investigation or proceeding against the Debtor's officers and agents. Next, there is no evidence that Global participated in any of the criminal proceedings. Finally, without such evidence, Global cannot show how any expenses it alleges to have incurred with respect to the criminal proceedings directly relate to the Debtor's case or benefited the Debtor's bankruptcy estate. Thus, Global has not met its burden of proof for the allowance of an administrative expense under section 503(b)(3)(C).

### (4)    Section 503(b)(3)(D) Expenses for Substantial Contribution.

While Global asserts that it has made a "material contribution" that benefitted this bankruptcy case, the lone provision of section 503(b) of the Bankruptcy Code that specifically allows an administrative expense priority for some form of material contribution references only actual, necessary expenses incurred by a creditor in making a "substantial contribution" in a chapter 9 or chapter 11 case. 11 U.S.C. § 503(b)(3)(D). There is no corresponding provision for the allowance of actual, necessary expenses incurred by a creditor in making a "substantial contribution" in a chapter 7 case. Some courts have held that the existence of a specific provision for "substantial contribution" in a chapter 9 or chapter 11 case under section 503(b)(3)(D) precludes the recognition of an unlisted administrative expense for "substantial contributions" made by a chapter 7 creditor. *In re Hackney,* 351 B.R. 179, 205 (Bankr. N.D. Ala. 2006) (finding that if Congress intended there to be a "substantial contribution" administrative expense in a chapter 7 case, it would not have limited section 503(b)(3)(D) to chapter 9 and chapter 11 cases); *In re Blount*, 276 B.R. 753, 763-64 (Bankr. M.D. La. 2002) (holding that even if a creditor is found to have substantially contributed to a chapter 7 case, section 503(b)(3)(D) is expressly limited to cases under chapter 9 or 11, and the creditor only has an unsecured claim).

Other courts have held that section 503(b) is not so restrictive. *In re Connolly N. Am., LLC*, No. 13-2489, 2015 WL 5515229, at *6, __ F.3d __ (6th Cir. Sept. 21, 2015) (holding that "§ 503(b)(3)(D) of the Bankruptcy Code does not divest bankruptcy courts of authority to allow reimbursement under § 503(b) of reasonable administrative expenses of creditors whose efforts substantially benefit the bankruptcy estate and its creditors in a Chapter 7 proceeding"); *United States v. Ledlin (In re Mark Anthony Const. Inc.)*, 886 F.2d 1101, 1106 (9th Cir. 1989) (finding that the structure of section 503(b) is

inconsistent with a restrictive interpretation of its list of administrative expenses, and the use of the word "including" implies that the terms listed therein are not exhaustive examples). A bankruptcy court in this district, similarly, has held that the use of the word "including" under the general section of 503(b) indicates that the nine enumerated categories listed in section 503(b) are intended to be "illustrative, not exhaustive." *In re Pappas*, 277 B.R. at 176 (*citing In re Colortex Indus.*, 19 F.3d 1371, 1377 (11th Cir. 1994)). Even if this Court were to hold that actual and necessary expenses incurred by a creditor that made a "substantial contribution" to a chapter 7 case can be given administrative expense priority status, the creditor must demonstrate that (i) its services bestowed a substantial benefit to the estate and assisted in recovery of assets, and (ii) "to the extent that a creditor is claiming that it 'assisted the trustee,' it is necessary that the trustee agree that the creditor's efforts actually 'assisted' the trustee, in fact. . . .that 'but for' the assistance of the creditor, the trustee's efforts would not have yielded benefit to the estate." *Id.*

The Trustee does not credit Global with providing any assistance to his administration of the bankruptcy estate and objects to the characterization of Global's claim against the estate as anything other than a general unsecured claim. The Court's own independent review of the record and evidence submitted by Global fails to show how Global's prepetition litigation against the Debtor and the Ashley Defendants or the turnover of the Debtor's bank statements assisted the Trustee in his administration of this case. There is no evidence that "but for" Global's services, the Trustee's efforts would not have yielded the Ashley Settlement, especially when the Trustee commenced the litigation against the Ashley Defendants and negotiated the Ashley Settlement without Global's assistance. Any benefit to the estate provided by Global as a result of its actions did not rise to the level of a substantial contribution under section 503(b) but was at most merely incidental to the Trustee's own investigation and recovery efforts. Accordingly, Global has failed to demonstrate that its claim should be accorded administrative priority expense status under section 503(b)(3)(D).

### b.    Section 507(a)(7) Consumer Deposits Priority.

Although Global does not make any mention of section 507(a)(7) of the Bankruptcy Code in its

Claim Allowance Motion or opposition to the Claims Objection Motion, the face of Claim No. 27 asserts

an entitlement to be paid as a priority unsecured claim under section 507(a)(7).  Of the ten enumerated

categories of priority under section 507(a), section 507(a)(7) allows a seventh level of priority for:

> allowed unsecured claims of individuals, to the extent of [$2,600][6] for
> each such individual, arising from the deposit, before the commencement
> of the case, of money in connection with the purchase, lease, or rental of
> property, or the purchase of services, for the personal, family, or
> household use of such individuals, that were not delivered or provided.

11 U.S.C. § 507(a)(7).  While the term "deposit" is not defined in the Bankruptcy Code, section 507(a)(7)

contemplates at minimum that (1) the creditor's claim arises from a deposit of money, and (ii) the goods

or services remain undelivered.   *In re Four Star Fin. Servs., LLC*, 469 B.R. 30, 32 (C.D. Cal. 2012).

In this case, the Court can only speculate that Global thought that Claim No. 27 came within the

parameters of section 507(a)(7) because the Debtor may have received deposits from buyers seeking a

mortgage for their home purchase or mortgagors seeking to refinance their mortgages with the assistance

of the Debtor.  First, section 507(a)(7) specifies that the priority is given to allowed unsecured claims of

individuals and Global is a corporate entity.  Second, as a corporate entity, any claim it may have against

the Debtor could never be related to the "personal, family, or household use" of Global.  Third, Global, as

a creditor, did not tender any deposit to the Debtor.  Lastly, there was no expectation between the Debtor

and Global that the Debtor would provide Global with goods or services.  Rather, it was Global that

provided or agreed to provide appraisal services in exchange for monetary compensation.  Thus, Global

has failed to demonstrate that Claim No. 27 satisfies the necessary elements for priority status under

section 507(a)(7).

### 3.    Whether Claim No. 27 Arises From An Executory Contract.

Alternatively, Global argues that Claim No. 27 is entitled to priority as an administrative expense

---

[6] The amount of a claim entitled to priority is adjusted every three years.  11 U.S.C. § 104(a). The $2,600 amount represents the statutory amount established under section 507(a)(7) at the time this bankruptcy case was commenced.

arising from an executory contract under section 365 of the Bankruptcy Code.  However, after extensive

oral argument at the Hearings on this issue, Global admitted at the Aug. 8 Hearing that no written contract

existed between it and the Debtor.  Global acknowledged that it was one of five vendors on the Debtor's

list of approved appraisers and it was the Debtor's business practice to request an appraisal without first

entering into any written agreement.  Nevertheless, Global contends that because various aspects of

"Federal Mortgage Law" and USPAP require appraisals be paid, "Federal Mortgage Law" and USPAP

dictated the relationship between the Debtor and Global.  This relationship, it claims, somehow gave rise

to an executory contract under section 365 of the Bankruptcy Code and that if assumed by the Trustee,

Global would be entitled to immediate payment of its claim.  While the absence of a written contract

between the parties alone renders section 365 of the Bankruptcy Code inapplicable to the Default

Judgment and Global's claim against the bankruptcy estate, in light of Global's assertion, the Court

considered whether the Global "contract" is executory and concludes that (i) there is no executory

contract between the parties, and (ii) even if there was an executory contract, it has been deemed rejected

by operation of law under 11 U.S.C. § 365(d)(1).

The term "executory contract" is not defined in the Bankruptcy Code but legislative history

regarding section 365 states that "though there is no precise definition of what contracts are executory, it

generally includes contracts on which performance remains due to some extent on both sides."  H.R. Rep.

No. 595, 95th Cong., 1st Sess. 347 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), U.S. Code

Cong. & Admin. News 1978, pp. 5787, 5844, 6303.  Courts in the Second Circuit have generally adopted

the definition expounded by Professor Vern Countryman, i.e., an executory contact is "a contract under

which the obligation of both the bankrupt and the other party to the contract are so far unperformed that

the failure of either to complete performance would constitute a material breach excusing performance of

the other."  Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460

(1973).  *See COR Route 5 Co., LLC v. The Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 379

(2d Cir. 2008); *In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 276 (Bankr. S.D.N.Y. 2013); *In re Calpine

Corp.*, No. 05-60200 (BRL), 2008 Bankr. LEXIS 2152, at * 13 (Bankr. S.D.N.Y. Aug. 4, 2008); *Shoppers*

*World Community Center, L.P. v. Bradlees Stores, Inc. (In re Bradlees Store, Inc.)*, No. 01-CV-3934 (SAS), 2001 U.S. Dist. LEXIS 14755, at *20 (S.D.N.Y. Sept. 20, 2001); *In re Chateaugay Corp.*, 102 B.R. 335, 345 (S.D.N.Y. 1989); *In re Bluman*, 125 B.R. 359, 362 (Bankr. E.D.N.Y. 1990).  "In other words, under Countryman's 'material breach' test, a prepetition contract is executory when both sides are still obligated to render substantial performance." *In re Calpine Corp.*, 2008 Bankr. LEXIS 2152, at * 13. Similarly under the same test, executory contracts exclude those contracts where one party has completed performance and the only performance that remains is the payment of money by the other party.  *Id.*, at *15; *In re Chateaugay Corp.*, 102 B.R. at 345.

The courts in the Second Circuit have also applied a more flexible so-called "functional approach" developed by Professor Jay Westbrook which finds the existence of an "executory contract" notwithstanding the fact that only one of the parties to a contract has material obligations outstanding.  *In re Bradlees Stores, Inc.*, No. 00-16033, 2001 Bankr. LEXIS 2192, at * 16-17 (Bankr. S.D.N.Y. Mar. 28, 2001); *In re Chateaugay Corp.*, 102 B.R. at 345; *In re Bluman*, 125 B.R. at 363.  *See* Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn. L. Rev. 227 (1989).  Under the Westbrook analysis, "even though there may be material obligations outstanding on the part of only one of the parties to the contract, [the contract] may nevertheless be deemed executory under the functional approach if its assumption [or] rejection would ultimately benefit the estate and its creditors." *In re Gen. Dev. Corp.*, 84 F.3d 1364, 1374 (11th Cir. 1996).

A trustee, subject to the court's approval, may assume or reject an executory contract.  11 U.S.C. § 365(a).  The Second Circuit has noted that "[t]he main purpose of [s]ection 365 is to allow a debtor to reject executory contracts in order to relieve the estate of burdensome obligations while at the same time providing 'a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so.'"  *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.),* 10 F.3d 944, 954-55(2d Cri. 1993) (*quoting Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310 (5th Cir. 1985)).  *See also Penn Traffic Co.*, 524 F.3d at 382.  In evaluating whether an executory contract should be assumed or rejected, consideration is given to factors

33

such as "(1) taking advantage of contracts which will benefit the estate; (2) relieving the estate of burdensome contracts; (3) promoting the debtor's fresh start; (4) permitting the allowance and determination of claims; and (5) preventing parties from remaining 'in doubt concerning their status vis-à-vis the estate.'"  *In re Bluman*, 125 B.R. at 363 (*quoting In re Monument Record Corp.*, 61 Bankr. 866, 868 (Bankr. M.D. Tenn. 1986)).

"Assumption is in effect a decision to continue performance."  *Penn Traffic Co.*, 524 F.3d at 378. In order to assume an executory contract, the trustee must first cure most defaults and compensate the non-debtor party to the executory contract for any actual pecuniary loss resulting from the debtor's default.  11 U.S.C. § 365(b)(1).  This will require essentially the immediate payment of what is owed to the non-debtor party in order to continue the parties' rights to future performance under the contract. Accordingly, assumption of an executory contract would result in the non-debtor party being paid ahead of other creditors, including administrative creditors.  It is elevating what is nothing more than a prepetition claim into the functional equivalent of an administrative expense.  On the other hand, rejection of an executory contract is a breach of the contract.  11 U.S.C. § 365(g)(1).  "In the event of rejection, the non-debtor party is generally relegated to pursuing an unsecured prepetition claim against the estate." *Penn Traffic Co.*, 524 F.3d at 378.  "Where assets of the estate are insufficient to pay unsecured creditors in full, the non-debtor party to a rejected executory contract, like other unsecured creditors of the estate, may receive only a fraction of the value of its claim."  *Id.*

Where a trustee does not assume or reject an executory contract within a limited time, the executory contract is deemed rejected by operation of law.  As set forth in pertinent part under section 365(d)(1):

> [i]n a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

11 U.S.C. § 365(d)(1).  "The term 'deemed rejected' in § 365 has been interpreted as providing for a self-

executing statute of limitations on the trustee's time to act in assuming an executory contract." *In re Annabel*, 263 B.R. 19, 22 (Bankr. N.D.N.Y. 2001).

If the Court were to assume that a contract did exist between Debtor and Global regarding the appraisals, Global fully performed all of its obligations prior to the Petition Date. Either the appraisals were provided prepetition to the Debtor or the appraisal orders were cancelled, and Global invoiced the Debtor for the cost of the completed appraisals or its fees for the cancelled appraisal orders. The absence of any further obligation on the part of Global to the Debtor is supported by the fact Global obtained the Default Judgment against the Debtor prepetition for its failure to pay Global's invoices. The only obligation outstanding under the "contract" is the Debtor's obligation to pay Global. "If performance remains due on only one side, the contract is not executory, and hence neither assumable nor capable of rejection." *Hawker Beechcraft, Inc.*, 486 B.R. at 276. Therefore, under the Countryman definition and the cases in the Second Circuit following Countryman, the purported contract between the Debtor and Global would not be executory and thus could not be assumed under section 365. *Id. See also In re Calpine Corp.*, 2008 Bankr. LEXIS 2152, at * 15; *In re Chateaugay Corp.*, 102 B.R. at 347.

Even if the Court were to apply the more flexible functional approach expounded by Professor Westbrook, i.e., a contract may be executory notwithstanding the fact that only the Debtor's obligation to perform remains outstanding, there is no postpetition benefit to the estate if the Trustee were to assume the purported contract between the parties. The Debtor has already received the benefit of the bargain prepetition in the form of the completed appraisals. Because the Debtor has ceased operations prepetition, there is no business justification for the Trustee to pay Global's claim to assume a contract for which there is no continued future performance by Global. "Under this [functional] approach, a contract is not executory if the bargained for benefits were received by the debtor prepetition, or if the assumption would saddle the estate with potentially onerous obligations, while rejection would confer benefits." *In re Chateaugay Corp.*, 102 B.R. at 345 n.11 (noting that while it used the Countryman definition in its analysis, some courts have adopted the functional approach and a similar result would have been achieved under either one). Assumption of the purported contract would saddle the estate with the burdensome

obligation to pay Global's prepetition unsecured claim of $763,157, plus interest, ahead of other claims, including administrative expense claims, and would result in fewer assets being available for distribution to general unsecured creditors.  Assumption is particularly onerous when $717,740 of the $763,157 Default Judgment amount is for cancelled appraisal orders for which the Debtor did not receive any benefit.  In the exercise of his business judgment, the Trustee would reject any such contract and Global's claim would be treated as a general unsecured claim.

In any event, under section 365(d)(1), the Trustee is deemed to have rejected any purported executory contract between Global and the Debtor.  The order for relief was entered on December 29, 2010.  The Trustee did not assume or reject any contract between the Debtor and Global within the 60-day period after the order for relief was entered in this bankruptcy case, nor did he seek additional time to assume or reject such a contract.  Therefore, by operation of section 365(d)(1), even if the Court were inclined to find the existence of an executory contract, such executory contract has been deemed rejected. While Global demands in its pleadings that the Trustee be compelled to assume the purported executory contract with Global, the time to do so has long passed.  As a result, Global has a prepetition, general unsecured claim for damages for breach of contract.  11 U.S.C. §§ 365(g) and 502(g)(1).  *See also In re Hawker Beechcraft, Inc.*, 486 B.R. at 277 (explaining that "the rejection of an executory contract is the economic equivalent of the debtor's refusal to perform a non-executory contract giving rise to the same unsecured claim").  Accordingly, Global's claim is not entitled to be paid ahead of other general unsecured claims.

### 4.    Earmarking Doctrine.

Throughout the Claims Allowance Motion, Global asserts that funds held by the Debtor were earmarked for Global.  The earmarking doctrine generally arises in the context of an avoidance action by the bankruptcy estate to recover funds of the debtor received by a creditor, particularly in the context of a preference action.  In order for a transfer to be avoidable by a trustee in a preference action, the transfer must be of "an interest of the debtor in property" as set forth in 11 U.S.C. § 547(b).  *Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 184 (2d Cir. 2007).  In determining what constitutes "an interest of the

debtor in property", courts have developed the concept of the "earmarking doctrine" which applies "where a third party lends money to the debtor for the specific purpose of paying a selected creditor." *Id.* (*quoting Glinka v. Bank of Vt. (In re Kelton Motors, Inc.)*, 93 F.3d 22, 28 (2d Cir. 1996)). A defendant invoking the earmarking doctrine as a defense would argue that because the debtor was a mere conduit of the funds at issue, the funds never became property of the estate. The Second Circuit has held that "where a debtor receives funds subject to a clear obligation to use that money to pay off an preexisting debt, and the funds are in fact used for that purpose, those funds do not become property of the estate". *Id*, 503 F.3d at 185. *See also McCuskey v. The Nat'l Bank of Waterloo (In re Bohlen Enter., Ltd.)*, 859 F.2d 561, 565-66 (8th Cir. 1988).

Here, the Trustee has not commenced a preference action against Global so there is no earmarking defense to be raised. Global's earmarking argument presumes, *inter alia*, that the Debtor had an agreement with a third party to pay funds directly to Global or that the Debtor would receive such funds as a conduit and pay the funds over to Global. There is no evidence in the record that the Debtor had such an agreement with a third party for the payment of any debts or obligations of the Debtor to Global. Moreover, Global did not receive any funds that purportedly may have been earmarked for Global; otherwise, it would not have instituted the Global Action or obtained the Default Judgment. Thus, the earmarking doctrine simply does not apply to Global's situation.

In sum, Global has not cited to any authority or provision of the Bankruptcy Code that supports its position that, under the circumstances of this case, a claim filed by an appraisal management company or an appraiser for prepetition services shall be paid in full before any other creditor of the bankruptcy estate as either (i) a secured claim, in the absence of proof that the claim is secured by a lien on assets of the Debtor or (ii) an unsecured claim entitled to administrative expense priority status. As to the latter, if Congress desired to confer administrative expense priority status or such other priority status with respect to prepetition claims asserted by appraisers, it could have done so under sections 507(a) or 503(b) of the Bankruptcy Code. It did not. "[I]f one claimant is to be preferred over others, the purpose should be clear from the statute." *Trustees of Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 101 (2d Cir.

1986) (*quoting Nathanson v. N.L.R.B.*, 344 U.S. 25, 29 (1952)).  Accordingly, Global's claim against the

bankruptcy estate, i.e., Claim No. 27, must be reclassified as a general unsecured claim.

**III.    Request for Relief from Stay.**

Global sought to lift the automatic stay in order to have its claim against the estate be paid

immediately.  As set forth under section 362(a) of the Bankruptcy Code in pertinent part, the filing of a

bankruptcy petition operates as a stay, applicable to all entities, of the following:

> (2) the enforcement, against the debtor or against property of the estate,
> of a judgment obtained before the commencement of the case under this
> title;
> . . .
>
> (6) any act to collect, assess, or recover a claim against the debtor that
> arose before the commencement of the case under this title.

11 U.S.C. §§ 362(a)(2) and (6).  Any action by Global outside of the bankruptcy court either to enforce

the Default Judgment against the bankruptcy estate or to collect and recover on the Default Judgment, is

specifically prohibited by the automatic stay under section 362(a).  The purpose of the automatic stay is

not only to protect the debtor and property of the estate but also to protect creditors from acts of other

creditors who attempt to seize property of the estate first in order to satisfy their own claims.  *In re

Ampal-American Israel Corp.*, 502 B.R. 361, 369 (Bankr. S.D.N.Y. 2013).  "Those who acted first would

obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is

designed to provide an orderly liquidation procedure under which all creditors are treated equally.  A race

of diligence by creditors for the debtor's assets prevents that."  *Id.*, 502 B.R. at 369-70 (*quoting* H.R. Rep.

No. 95-595, at 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6297; S. Rep. No. 95-989, at 49 (1978),

reprinted in 1978 U.S.C.C.A.N. 5787, 5835).

**A.    Section 362(b)(1).**

At the Aug. 8 Hearing, Global requested that, to the extent the Court does not grant Global

administrative expense priority status, it should be granted relief from stay to pursue legal action in

District Court and state court for alleged "federal crimes" arising from the Debtor's failure to pay on

Global's claim.  Aug. 8 Hearing Tr. at 28. [*dkt. no. 422*].  There are specific actions enumerated under

section 362(b) of the Bankruptcy Code which are not stayed by the filing of a bankruptcy petition and for which relief from stay need not be obtained, one of which is the "commencement or continuation of a criminal action or proceeding against the debtor." 11 U.S.C. § 362(b)(1). Global is not prevented from cooperating with the state and federal authorities in their investigation and in any criminal proceeding brought by them. However, to the extent Global seeks to file a postpetition criminal complaint against the Debtor, there is a split among courts on whether a creditor would run afoul of the automatic stay by filing a postpetition criminal complaint for the primary purpose of collecting a debt. *Otten v. Majesty Used Cars, Inc. (In re Otten)*, No. 12-8045-ast, 2013 WL 1881736, at *8-9 (Bankr. E.D.N.Y. May 3, 2013) (comparing cases). In this instance, the Court need not address whether any future conduct by Global in terms of commencing or continuing a criminal action would be in violation of the automatic stay because any such action is currently speculative nor can the Court preapprove any action Global may wish to pursue.

### B.    Section 362(d).

To the extent Global seeks relief from stay specifically for the purpose of enforcing or collecting on its Default Judgment, section 362(d) provides that the court may terminate or modify the automatic stay:

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an action against property under subsection (a) of this section, if –
   (A) the debtor does not have an equity in such property; and
   (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(1) and (2).

### 1.    Relief from Stay for Cause under Section 362(d)(1).

With respect to section 362(d)(1), the movant must make an initial showing that "cause" exists for relief from stay, and once this is established, then the burden of proof shifts to the debtor on all other issues under section 362(g). *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990). "If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to

continued protection." *Id.*  The term "cause" under section 362(d)(1) is not defined by the Bankruptcy

Code.  Courts have recognized what constitutes "cause" to be "a broad and flexible concept that must be

determined on a case by case basis." *In re AMR Corp.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013) (*citing*

*Spencer v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002)).

Notwithstanding such a broad and flexible standard for "cause" under section 362(d)(1), Global

has not satisfied its burden of proof to show that "cause" exists  for Global to proceed outside of the

bankruptcy court to enforce, collect or recover on the Default Judgment.  As set forth herein, as a holder

of a general unsecured claim against the estate, Global is not entitled to the immediate payment of its

claim from estate assets ahead of other general unsecured creditors nor can it proceed outside of

bankruptcy with respect to third parties who may be recipients of estate assets.  Those third party

avoidance actions are in the first instance the sole province of the Trustee.  To do so would be in

contravention of the purpose of the automatic stay.  Global's request for relief from stay under section

362(d)(1) is therefore denied.

### 2.    Relief from Stay Due to Debtor's Lack of Equity under Section 362(d)(2).

As to relief from stay with respect to an action against the debtor's property under section

362(d)(2) due to the a debtor's lack of equity in such property, the party requesting relief from stay must

first be a creditor who has a security interest or lien against the property at issue.  *In re U.S. Physicians,*

*Inc.*, 236 B.R. 593 (Bankr. E.D. Pa. 1999) (denying unsecured creditors' motion under section 362(d)(2)

where the creditors do not have a valid security interest in the debtor's property); *In re Hunt Pier's*

*Assocs.*, 143 B.R. 36,  50 (Bankr. E.D. Pa. 1992) (finding that relief under section 362(d)(2) requires a

debtor's lack of equity in the property and can only be appropriately granted when the movant has a

security interest in that property).

As discussed above, Global has not met its burden of proof in demonstrating that it is a secured

creditor with respect to any of the Debtor's property.  There is no evidence that the Debtor granted Global

a security interest or a lien on its property, or that the Default Judgment or writ of execution attached as a

lien against any of the Debtor's assets.  Absent a security interest or a lien in the Debtor's property, the

Court cannot consider whether Global would be entitled to relief from stay under section 362(d)(2).

Accordingly, Global's request for relief from stay under section 362(d) must be denied.

**IV.    Global's Allegations against the Trustee and His Professionals.**

Global accuses the Trustee of knowingly and intentionally failing to assume Global's purported

contract with the Debtor in order to avoid having to pay on Global's claim.  Accordingly, Global demands

that the Trustee and his professionals be removed because the interest of the Trustee and his professionals

are conflicted, or essentially, adverse to the interest of Global by (a) putting the fees of the Trustee and his

professionals ahead of Global's claim, (b) allegedly making false statements and material omissions to the

Court in order to defraud Global, and (c) failing to commence any legal action against HUD for the

benefit of the estate.  Global also accuses HUD of failing to inform "market participants" of the civil and

criminal investigations against the Debtor and its officers while HUD was simultaneously allowing

Ashley to continue to originate and bundle mortgages to the detriment of Global and creditors.

**A.    Compensation to the Trustee and His Professionals.**

Under the Bankruptcy Code, compensation and reimbursement to a trustee and his professionals

are administrative expenses and are paid before distribution to holders of allowed general unsecured

creditors. 11 U.S.C. § 503(b)(2).[7]  This is because the trustee and his professionals provide actual services

in preserving and recovering assets of the debtor for the benefit of creditors and Congress recognizes that

they should be compensated for their efforts ahead of other creditors.  *Trustees of Amalgamated Ins.*

*Fund*, 789 F.2d at 101 (stating that "Congress granted priority to administrative expenses in order to

facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all

the estate's creditors.") Moreover, applications for compensation and reimbursement of expenses

submitted by the Trustee and his professionals (1) are reviewed first not only by the Office of the United

States Trustee but also but the court for reasonableness of the fees for the services provided to the estate

---

[7] 11 U.S.C. § 503(b)(2) provides that:
> After notice and a hearing, there shall be allowed administrative expenses, other than claims
> allowed under section 502(f) of this title, including –
>> (2) compensation and reimbursement awarded under section 330(a) of this title.

as required under 11 U.S.C. §§ 330 and 331, and (2) are awarded after notice to parties in interest and the United States Trustee, and a hearing by the court.

Therefore, the right of the Trustee in this case and his professionals to be paid ahead of general unsecured creditors is established by the Bankruptcy Code. When the Trustee and his professionals previously submitted their first interim applications for compensation and reimbursement of expenses to the Court, Global filed an objection on December 11, 2012 [*dkt no. 298*] which essentially demanded that Global's claim be paid ahead of the fees and expenses incurred by the Trustee and his professionals. Global's objection was overruled by Judge Eisenberg pursuant to an order dated December 19, 2012 [*dkt no. 306*], which awarded the interim fee applications. There was no objection by the Office of the United States Trustee or finding by the Court that the Trustee and his professionals did not perform the services for which compensation was requested, that the services rendered were inappropriate, or that their requests for the payment of interim fees at the time were unreasonable. Needless to say, Global has not demonstrated how the services rendered by the Trustee and his professionals and their request for fees constituted some sort of conflict with the interests of the bankruptcy estate.

Global's main contention is that it desires to have its claim be paid in full immediately. Global's frustration at the delay in receiving any distribution on its claim is understandable given that the Debtor has been in bankruptcy for five years and unsecured creditors have yet to receive a distribution while the Trustee and some of his professionals have received interim distributions on their legal fees and expenses. However, this is a complex bankruptcy case and the Trustee and his professionals are still in the process of pursuing the recovery of assets as shown by the various pending motions filed by the Trustee on the bankruptcy docket. Also, the Trustee commenced seven adversary proceedings in this case of which two remain pending. A creditor's dissatisfaction with the speed at which a case is being administered is not sufficient cause for removal of a trustee or his professionals.

**B.    Allegations of Conflict or Misconduct.**

In determining whether a trustee should be removed, section 324(a) of the Bankruptcy Code provides that "[t]he court, after notice and a hearing, may remove a trustee, other than the United States

trustee, or an examiner, for cause." 11 U.S.C. § 324(a). In defining "cause" under section 324 of the Bankruptcy Code, the Second Circuit has "traditionally stressed the elements of fraud and actual injury to the debtor interests." *In re Haworth*, No. 08-5791, 2009 U.S. App. LEXIS 27457, at *2 (2d Cir. Dec. 16, 2009) (*quoting In re Freeport Italian Bakery, Inc.*, 340 F.2d 50, 54 (2d Cir. 1965)); *In re Lundborg*, 110 B.R. 106, 108 (Bankr. D. Conn. 1990) (holding that "a party seeking removal of a trustee must prove that there has been some actual injury or fraud"). The party seeking removal bears the burden of proof. *Lundborg*, 110 B.R. at 108; *In re Belmonte*, 524 B.R. 17, 28 (Bankr. E.D.N.Y. 2015).

Therefore, when determining whether to remove a trustee, courts are mindful that:

> a trustee should not be removed for mistakes in judgment where the judgment was discretionary and reasonable under the circumstances, … and courts should consider the best interests of the estate, rather than those of a single movant-creditor ….

*Lundborg*, 110 B.R. at 108 (*citing In re Haugen Constr. Serv., Inc.*, 104 B.R. 233, 240 (Bankr. D.N.D. 1989)). In addition, "cause" under section 324 requires more than unsupported inferences. *In re Belmonte*, 524 B.R. at 28 (refusing to entertain objections to the trustee's administration of the bankruptcy estate where the trustee exercised his good faith judgment on a reasonable basis and was within the scope of his authority.) "A conclusory contention unsupported by specific facts does not constitute sufficient grounds for the removal of a trustee." *In re Regan*, 403 B.R. 614, 623 (B.A.P. 8th Cir. 2009) (*quoting Alexander v. Jensen-Center (In re Alexander)*, 289 B.R. 711, 714 (B.A.P. 8th Cir. 2003)).

The Court finds Global's accusations of false statements and material omissions by the Trustee and his counsel to be conclusory statements unsupported by any evidence in the record that would be a basis for such allegations. Global has not identified with specificity what false statements or material omissions were made by the Trustee and his counsel; when they were made, if at all; how Global or the bankruptcy estate relied upon such statements or omissions; and what damages resulted from such reliance. Bald accusations without proof of actual fraud and injury do not constitute cause for removal of a trustee and/or his professionals under section 324(a) of the Bankruptcy Code. *In re Belmonte*, 524 B.R. at 29 (denying motion for removal of a trustee where the debtor not only failed to make the required

"strong showing" to warrant removal but also to make any showing for removal of the trustee); *In re Regan*, 403 B.R.at 623 (affirming bankruptcy court's denial of motion to remove a trustee where there is no evidence of any misconduct or misjudgment but just conclusory contentions unsupported by specific facts and disagreement with the trustee's business management of the case.)

### C.    Failure to Proceed Against HUD.

Global's allegations that causes of action exist against HUD and its demand that the Trustee be compelled to sue HUD were raised previously in Global's Ashley Settlement Objection with respect to the No.12-8443 Action brought by the Trustee against the Ashley Defendants, and argued by Global at the March 4, 2014 hearing on the Trustee's motion pursuant to Bankruptcy Rule 9019 to approve the Ashley Settlement.  Judge Eisenberg considered Global's arguments and found that "[t]he fact that [the Trustee and his counsel] are not seeking to [file an adversary proceeding against HUD] doesn't mean that they're acting improperly."  Mar. 4, 2014 Tr. at 16 [No. 12-8443 Action, *dkt no. 27*].  Accordingly, the Court approved the Ashley Settlement and denied Global's objection pursuant to an order dated March 14, 2014.  [No. 12-8443 Action, *dkt no. 25*].  Global still has not articulated nor provided the Trustee or the Court with any evidence supporting a plausible claim against HUD and the Court sees no reason to reconsider these allegations at this time.

Thus, Global has not met its burden of proof in demonstrating cause exists under section 324(a) for removal of the Trustee and his professionals.  There is nothing in the record to support any claim by Global that the Trustee or his professionals engaged in any misconduct or wrongdoing before this Court.

### CONCLUSION

For the reasons set forth in this Memorandum Decision, the Claims Allowance Motion filed by Global is denied, and the Trustee's Claims Objection Motion is granted to the extent that Claim No. 4-1 and Claim No. 4-2 shall each be disallowed and expunged from the Court's Claims Register, and Claim

No. 27 shall be reclassified from a secured claim to a general unsecured claim.

A separate order shall be entered concurrently by the Court pursuant to this Memorandum Decision.



Dated: October 14, 2015
       **Central Islip, New York**

                                  **Louis A. Scarcella**
                            **United States Bankruptcy Judge**